UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| 3B HOLDINGS, INC., | ) | CASE NO.: 1:23-cv-1137 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| REVERE PLASTICS SYSTEMS, LLC, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Before the Court is Plaintiff 3B Holdings, Inc.'s partial Motion for Summary Judgment. (Doc. 22.)  Defendant Revere Plastics Systems, LLC responded (Doc. 27), and Plaintiff replied (Doc. 31).  Also before the Court is Plaintiff's Motion to Exclude Information in Violation of Rule 37(c)(1) and for attorneys' fees.  (Doc. 25.)  This motion is also fully briefed.  (Docs. 28, 33.)  For the reasons stated herein, both motions are DENIED.

I.  **BACKGROUND**

A.  **Statement of Facts**

3B Holdings, Inc., d/b/a 3B Supply ("3B" or "Plaintiff"), was an integrated supply provider located in Cleveland, Ohio.  (Doc. 22-1 at ¶ 2.)  3B offered maintenance, repair, and operations ("MRO") distribution solutions to industrial companies.  (*Id.*)  In practice, 3B supplied items not used in the direct production of goods, such as office supplies and equipment. (*Id.*)

Revere Plastics Systems, LLC ("Revere" or "Defendant") was a plastic injection molding company.  (Doc. 23-14 at ¶ 3.)  Revere's manufacturing facility in Clyde, Ohio (the "Revere Facility") was a 300,000 square foot facility with industrial equipment used for plastic injection molding, heat stamping, and sonic welding.  (*Id.*)

In 2021, Revere engaged 3B to provide MRO services at the Revere Facility. (Doc. 22-1 at ¶ 2; Doc. 23-14 at ¶ 3.) 3B drafted and used its standard Exclusive Supply Agreement (the "Agreement") when negotiating with Revere. (Doc. 22-1 at ¶¶ 4, 7; *see* Doc. 23-5.) The Agreement was for an initial term of three years. (Doc. 22-1 at ¶ 5.) The Agreement had a "Part I," which contained the commercial terms, and a "Part II," which contained the legal terms. (Doc. 23-5 at 384-411.)[1] Part I was dated June 1, 2021. (Doc. 22-1 at 300.) Revere signed Part I on July 14, 2021, and 3B signed it on July 19, 2021. (*Id.* at 305.) Part II of the Agreement was never executed. (Doc. 22-1 at ¶ 8; Doc. 22 at 284.)

Under Part I of the Agreement, 3B was to supply Revere's needed MRO products and provide guaranteed cost savings to Revere. (*See* Doc. 22-1 at 299-310.) Revere represented 3B would be its primary MRO provider and would purchase from 3B the MRO products listed in Appendix B. (*Id.* at 304.) 3B represented "it has the experience, capability, and personnel necessary to provide the MRO products and services set forth in this Agreement; and it will provide the MRO products and services in a commercially reasonable manner and in accordance with applicable laws and the terms and conditions of this Agreement." (*Id.* at 303.)

The Invoicing and Payment provision of the Agreement required: "[Revere]'s payment of invoices shall be remitted to 3B Supply within thirty (30) days of the date of the invoice. . . . [Revere] and 3B Supply will agree on the best methods of invoice consolidation and submission as business needs dictate, such as monthly, weekly, etc. Invoicing shall take place no less frequently than once per month." (*Id.* at 303.) Additionally, 3B was required to provide Revere with "the necessary information for [Revere] to remit payment as required hereunder." (*Id.*)

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

Given the considerable implementation costs associated with its MRO arrangements, 3B asserts it typically did not make a profit until at least one year into any MRO program. (*Id.* at ¶ 14.) For this reason, Part I of the Agreement included a liquidated damages provision to cover costs incurred if Revere terminated the contract without cause prior to the end of its three-year term. (*Id.* at ¶ 15.) Section 10.3 of the Termination provision of the Agreement stated: "Upon termination of this Agreement, [Revere] shall promptly, and in any event no later than agreed payment terms following such termination, make payment in full for all MRO products or services purchased but not paid for by [Revere] prior to such termination." (*Id.* at 304.) Section 10.4 of the Termination provision further provided:

> In the event [Revere] terminates this Agreement ***without cause*** within one (1) year from the date of the first product invoice from 3B Supply, [Revere] shall pay to Supply One Hundred Dollars ($100.00) per hour multiplied by the number of hours spent implementing [Revere]'s MRO program. In the event Buyer terminates this Agreement ***without cause*** during the second year from the date of the first product invoice, [Revere] shall pay 3B supply Seventy-Five Dollars ($75.00) per hour multiplied by the number of hours spent implementing [Revere]'s MRO program. In the event Buyer terminates this Agreement ***without cause*** during the third year from the date of the first product invoice, [Revere] shall pay 3B supply Fifty Dollars ($50.00) per hour multiplied by the number of hours spent implementing [Revere]'s MRO program. Such payment shall be considered liquidated damages and not a penalty.

(*Id.* at 304 (emphasis added).) The Agreement does not define "cause." (*See id.*)

The final provision of Part I of the Agreement stated, "The Agreement shall be deemed complete and in full force after both PART I (Commercial Sections) and PART II (Legal Sections) are completed and signed." (*Id.* at 304.)

To implement the MRO program at the Revere Facility, 3B was required to send employees to provide support and training, both on-site and remotely. (*Id.* at ¶ 13.) To do so, 3B hired two full-time employees for the sole purpose of working on-site at the Revere Facility.

(*Id.*) 3B hired Angela Schaffer as the Associate Program Manager and Bryce Simmons as the Assistant Program Manager. (Doc. 23-11; Doc. 27-2.)

3B began providing MRO services to Revere in October 2021. 3B issued its first product invoice to Revere on November 9, 2021. (Doc. 22-1 at ¶ 18.) In the following months, Revere asserts, and 3B disputes, Revere had issues with 3B's performance. (*See id.* at 311-25.)

On April 14, 2022, Angela Weichelt, the Revere Facility's Plant Controller, spoke with Nick Keesee, 3B's Implementation Manager, and others. (Doc. 23-24.) They discussed several of Revere's identified issues with 3B's performance. In an email dated April 15, 2022, Keesee sent a summary of the discussion. (*Id.* at 565, 568.) The summary listed ten "Identified Issues" and proposed a "Resolution" for each. (*Id.* at 568.) Examples of the identified issues included: invoices not being delivered timely; lack of savings report; and issues with incorrect ordering and billing. (*Id.*) Some of the proposed resolutions included: delivering monthly invoices by or before the 5th of the month; savings report to be delivered monthly; and an invoice audit. (*Id.*)

On April 21, 2022, Revere's counsel sent 3B a letter (the "Termination Letter") providing "formal notice of Revere's decision to terminate the Agreement with 3B effective immediately." (Doc. 22-1 at 311-14.) Revere asserted "3B is in default and/or breach of this Agreement" and listed eleven purported breaches under Part I: (1) failure to deliver timely invoices per Article 7; (2) failure to provide on-site representatives per Article 3, Article 6, and Appendix A.21; (3) incorrectly invoicing Revere for materials purchased by 3B personnel for personal use; (4) failure to issue Revere purchase credits following return of items ordered in error per Article 4; (5) failure to provide savings reports as promised; (6) failure to maintain accuracy of all defined 3B supply inventories per Appendix A.1; (7) failure to issue spot by requisitions per Appendix A.11; (8) placing orders on multiple occasions outside of the approved methods of order

submission per Article 3 and Article 6; (9) violation of Revere policies and procedures when, on March 25, 2022, 3B personnel brought their minor child into the Revere Facility, including in manufacturing areas, which exposed both 3B and Revere to significant potential liability; (10) a breach of cybersecurity related to a cyberattack/phishing attempt that was traced back to a 3B email account; and (11) unauthorized interference with facility internet access by 3B. (*Id.* at 311-12.)

Revere considered such breaches contrary to 3B's representations in Part I of the Agreement that 3B: "has experience, capability, and personnel necessary to provide the MRO products and services set forth in this Agreement," and "will provide the MRO products and services in a commercially reasonable manner and in accordance with applicable laws and the terms and conditions of this Agreement." (*Id.* at 313.)

The letter further noted, "Revere representatives have previously notified and discussed the above breaches and failure to perform with 3B, as recently as April 14, 2021. Accordingly, this letter constitutes a renewed notice of 3B's breach of the Agreement. The Agreement and applicable law do not require any opportunity to cure these breaches beyond what has already been provided to you, in good faith, by Revere." (*Id.*) Revere therefore "consider[ed] the Agreement *terminated for cause* . . . ." (*Id.* (emphasis in original).) Revere reserved all rights under the Agreement and stated the letter was sent "subject to Revere's continuing internal investigation and analysis." (*Id.*)

On May 4, 2022, counsel for 3B responded to Revere's Termination Letter. (*Id.* at 315-19.) 3B asserted "Revere has chosen to terminate the Agreement without cause and (with one non-material exception) has fabricated the 11 reasons set forth in the Termination letter in a transparent attempt to avoid payment of the implementation fees as provided in section 10.4 of

the Agreement for a not-for-cause termination of the Agreement within its first year." (*Id.* at 315.) 3B was "willing to concede the possibility that one of its female employees brought her minor child with her to work" at the Revere Facility." (*Id.* at 317.) But 3B insisted it was "at best, a non-material breach of the Agreement, and at worst, a non-issue given the fact that it was not raised until four weeks after the fact." (*Id.* at 318.) 3B further asserted it never admitted to the other ten alleged breaches, and any discussions between Revere and 3B were customer service obligations, not requirements under the Agreement. (*Id.*)

To 3B, Revere's Termination Letter was an attempt to create "cause" to avoid the implementation fees under Section 10.4 of the Agreement for a not-for-cause termination within the first year of the Agreement. (*Id.*) 3B expended 2,910 hours implementing Revere's MRO program, and thus was owed $291,000 as liquidated damages under the Agreement. (*Id.*) 3B also asserted Revere owed 3B for its unpaid invoices through April 21, 2022. (*Id.*) 3B submitted an accounts receivable report, which it claims demonstrated Revere owed a total of $171,692.10 in past due invoices. (*Id.* at ¶ 27, 320-25.)

Revere asserts its investigation uncovered additional performance failures by 3B. (Doc. 27 at 668-72.) 3B failed to disclose Schaffer had a criminal background, including a charge of Child Endangerment. (Doc. 23-16; Doc. 23-22.) Revere asserts this was material because, on at least three occasions, Schaffer brought her minor child into the Revere Facility. (Doc. 23-14 at ¶ 10.) In February of 2022, 3B caused a 6-hour shut down of a production line at the Revere Facility by failing to stock a required MRO product. (*Id.* at ¶¶ 8-9.) 3B failed to provide quarterly cost savings reports. (*See* Doc. 23-23 at 563; Doc. 23-24 at 568.) And 3B failed to provide timely invoices and failed to properly order products. (Doc. 27 at 670-72; Doc. 27-4 at ¶¶ 4-11; Docs. 27-5, 27-6, 27-7, 27-8.) According to Revere, 3B failed to identify the Revere

employee who allegedly requested or authorized the products ordered by 3B, which made it impossible for Revere to verify the accuracy of the invoices. (*Id.*) Upon a closer review 3B's invoices, Revere discovered several inaccuracies, which is why 3B acknowledged an audit of 3B's invoices was necessary. (*Id.*; Doc. 23-24 at 568.)

B.   **Procedural History**

On May 8, 2023, 3B commenced an action against Revere in the Cuyahoga County Court of Common Pleas alleging breach of contract and unjust enrichment. (Doc. 1 at 1-2.) On June 7, 2023, Revere timely removed this action to this Court.[2]

On July 26, 2024, 3B moved for partial summary judgment on its breach of contract claims against Revere.[3] (Doc. 22.) Revere responded (Doc. 27), and 3B replied (Doc. 31).

Also on July 26, 2024, Revere moved for partial summary judgment as to 3B's request for liquidated damages. (Doc. 23.) 3B responded (Doc. 24), and Revere replied (Doc. 32).

On August 26, 2024, 3B moved to exclude information Revere relied on in its partial summary judgment motion and for attorneys' fees under Rule 37(c)(1). (Doc. 25.) Revere responded (Doc. 28), and 3B replied (Doc. 33).

On September 6, 2024, Revere moved for permission to file documents under seal, or, alternatively, to determine certain documents Revere filed are appropriately filed. (Doc. 29.) 3B did not respond or otherwise state any basis to maintain the identified documents under seal.

---

[2] Although the parties dispute whether the fully executed version of Part I of the Agreement was properly attached to the removal complaint, the record demonstrates that both parties signed Part I of the Agreement and it is properly before this Court. (*See* Doc. 5 at 57; Doc. 22-1 at 305; Doc. 26; Doc. 30; Doc. 34.)

[3] 3B did not move for summary judgment on its unjust enrichment claim.

## II. LAW AND ANALYSIS

### A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted). A "material" fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) & (e). Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted).  The Court's role is not to make credibility determinations or "weigh" conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

B.  **3B's Breach of Contract Claims**

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (applying Ohio law).

3B asserts it is entitled to judgment as a matter of law on its breach of contract claim because Revere "fail[ed] to pay invoices as required by the Agreement" and "fail[ed] to pay the early termination liquidated damages." (Doc. 22 at 288.)  "Because Revere has no valid defenses for its undisputed failure to pay, 3B is entitled to judgment as a matter of law," 3B urges. (*Id.*)

3B has mistaken its burden on summary judgment.  Under Rule 56, the movant must show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Williams*, 9 F.4th at 430.  It is 3B's burden to establish its breach of contract claim.  3B has not done so here.  Apart from authority for the summary judgment standard and two general cases on the enforceability of liquidated damage provisions, 3B's opening brief does not cite any relevant legal authority.  (*See* Doc. 22 at 283-93.)

Notwithstanding a cursory cite to the elements of a breach of contract claim, 3B has not cited any case law establishing the existence of an enforceable contract under Ohio law.  (*Id.* at 288.)  Instead, 3B assumes, without any supporting legal authority, that because the parties executed Part I of the Agreement that 3B drafted, there was a valid and enforceable contract.  (*Id.*)  But the explicit language in Part I states the Agreement would be "complete and in full force" after both Part I **and** Part II were completed and signed.  (Doc. 22-1 at 304 (emphasis added).)  3B asserts, without any legal authority, there was still an enforceable agreement between the parties because Part I was executed, and the signing of Part II was not a condition precedent to the enforceability of Part I.  (Doc. 22 at 289.)  3B's scant reference to the parties' course of performance, again without supporting case law, does not establish the existence of a contract.  (*Id.*)

3B's reply brief fares no better.  The only case law citations relate to the liquidated damages provision.  (Doc. 31 at 897-910.)  And for the first time, 3B makes cursory references to the Uniform Commercial Code (the "UCC").  (*Id.* at 897, 904.)  But in a mixed contract for goods and services, the burden of proof for demonstrating the UCC applies lies with the party who asserts the contract is governed by the UCC.  *Timken Co. v. MTS Sys. Corp.*, 539 F. Supp. 3d 770, 785 (N.D. Ohio 2021) (citations omitted).  3B has not cited any authority demonstrating the UCC applies.  (Doc. 31 at 897, 904.)  And 3B may not raise new arguments the first time in its reply brief.  *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003) (new arguments in a reply brief vitiate a nonmovant's ability to respond and is problematic under Rule 56(c)).

3B has not met its Rule 56 burden to establish the existence of a contract, let alone that Revere breached such a contract.  At bottom, 3B has not put forth a motion from which this

Court can determine 3B is entitled to judgment as a matter of law. The Court must therefore deny 3B's motion for summary judgment.

   **C.**  **3B's Motion to Exclude Information and for Attorneys' Fees**

  3B asserts the Court should disregard and exclude arguments that Revere relies on in seeking partial summary judgment. (Doc. 25 at 606.) According to 3B, Revere did not disclose in discovery:

   1. Schaffer had three prior arrests for criminal misdemeanors;

   2. On "three separate occasions," instead of the just one occasion previously identified, Schaffer's minor child was at the Revere Facility; and

   3. 3B failed to stock vending machines, which supposedly caused a six-hour shutdown. (*Id.*)

Revere did not identify these breaches in its April 21, 2022 Termination Letter, and it did not supplement its answer to Interrogatory No. 4, which asked Revere to identify all of 3B's alleged material breaches. (Doc. 25-1 at 609-10.)

  Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). Rule 26(e) requires a party to supplement an interrogatory response if it "learns the response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e).

  To 3B, because Revere did not supplement its answer to Interrogatory 4 to include the allegedly undisclosed breaches, Rule 37(c)(1) automatically prohibits Revere from relying on that conduct in support of its partial motion for summary judgment. (Doc. 25-1 at 612.) The

Court should exclude it, and 3B is entitled to attorneys' fees, because Revere failed to supplement its discovery responses, 3B urges. (*Id.* at 610.) 3B asserts, without supporting legal authority, that Revere has no justification for failing to supplement its discovery response, and Revere's failure to supplement was not harmless under Rule 37(c)(1). (*Id.* at 612-13.) 3B's reply brief does not add any case law support for these assertions. (Doc. 33 at 927-33.)

In response, Revere argues the evidence which 3B seeks to exclude consists of: (1) evidence that 3B produced itself; (2) evidence that 3B has been aware of since the outset of this litigation; (3) and evidence that Revere produced in discovery to 3B in October 2023, ten months before 3B filed its motion to exclude. (Doc. 28 at 792-93.)

First, with respect to Schaffer's prior arrests, this information came from 3B personnel files that 3B produced to Revere in May 2024. (*Id.* at 800; Doc. 28-9; Doc. 28-10; Doc. 28-11; Doc. 23-16.) This information is not subject to exclusion.

Second, with respect to Schaffer bringing her minor child into the Revere Facility, at least one occasion was disclosed to 3B as early as the April 21, 2022 Termination Letter. (Doc. 22-1 at 312.) Revere explicitly cited this conduct as a reason for terminating the parties' relationship, subject to its continuing investigation. (*Id.*) 3B acknowledged the minor was at the Revere Facility in its May 4, 2022 response. (*Id.* at 317.) That Revere later discovered Schaffer brought her minor child into the facility on two additional occasions is not reason to exclude that it happened at least once, which is undisputed.

Third, with respect to the production line shutdown, Revere produced supporting documentation, including a spreadsheet and five different emails, in its October 9, 2023 document production. (Doc. 28-2; Doc. 23-21; Doc. 28-4; Doc. 28-5.) Revere also referenced

this incident in its written discovery requests.  (Doc. 28-7 at 838.)  This information is also not subject to exclusion.

3B cannot claim Revere failed to supplement its discovery responses with information 3B itself produced, information it was aware of from the outset of this litigation, and information that was otherwise made known to 3B through Revere's document productions and written discovery.  Revere has not failed to provide this information to 3B under Rule 26(e) such that Rule 37(c)(1) mandates exclusion or sanctions.  For these reasons, 3B's motion to exclude information and for attorneys' fees is denied.

### III. CONCLUSION

For the reasons stated herein, Plaintiff's partial Motion for Summary Judgment (Doc. 22) is DENIED, and Plaintiff's Motion to Exclude Information in Violation of Rule 37(c)(1) and for attorneys' fees (Doc. 25) is also DENIED.

**IT IS SO ORDERED.**

**Date:**  March 28, 2025

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE