UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| 3B HOLDINGS, INC., | CASE NO.: 1:23-cv-1137 |
| Plaintiff, | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | |
| REVERE PLASTICS SYSTEMS, LLC, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Before the Court is Defendant Revere Plastics Systems, LLC's partial Motion for Summary Judgment. (Doc. 23.) Plaintiff 3B Holdings, Inc. responded (Doc. 24), and Defendant replied (Doc. 32). Also before the Court is Defendant's Motion for Permission to File Documents Under Seal or, alternatively, to determine certain documents are appropriately filed. (Doc. 29.)

For the reasons stated herein, Defendant's partial Motion for Summary Judgment is GRANTED, and Defendant's Motion for Permission to File Documents Under Seal is provisionally GRANTED.

I. **BACKGROUND**

    A. **Statement of Facts**

3B Holdings, Inc., d/b/a 3B Supply ("3B" or "Plaintiff"), was an integrated supply provider located in Cleveland, Ohio. (Doc. 22-1 at ¶ 2.) 3B offered maintenance, repair, and operations ("MRO") distribution solutions to industrial companies. (*Id.*) In practice, 3B supplied items not used in the direct production of goods, such as office supplies and equipment. (*Id.*)

Revere Plastics Systems, LLC ("Revere" or "Defendant") was a plastic injection molding company. (Doc. 23-14 at ¶ 3.) Revere's manufacturing facility in Clyde, Ohio (the "Revere Facility") was a 300,000 square foot facility with industrial equipment used for plastic injection molding, heat stamping, and sonic welding. (*Id.*)

In 2021, Revere engaged 3B to provide MRO services at the Revere Facility. (Doc. 22-1 at ¶ 2; Doc. 23-14 at ¶ 3.) 3B drafted and used its standard Exclusive Supply Agreement (the "Agreement") when negotiating with Revere. (Doc. 22-1 at ¶¶ 4, 7; *see* Doc. 23-5.) The Agreement was for an initial term of three years. (Doc. 22-1 at ¶ 5.) The Agreement had a "Part I," which contained the commercial terms, and a "Part II," which contained the legal terms. (Doc. 23-5 at 384-411.)[1] Part I was dated June 1, 2021. (Doc. 22-1 at 300.) Revere signed Part I on July 14, 2021, and 3B signed it on July 19, 2021. (*Id.* at 305.) Part II of the Agreement was never executed. (Doc. 22-1 at ¶ 8; Doc. 22 at 284.)

Under Part I of the Agreement, 3B was to supply Revere's needed MRO products and provide guaranteed cost savings to Revere. (*See* Doc. 22-1 at 299-310.) Revere represented 3B would be its primary MRO provider and would purchase from 3B the MRO products listed in Appendix B. (*Id.* at 304.) 3B represented "it has the experience, capability, and personnel necessary to provide the MRO products and services set forth in this Agreement; and it will provide the MRO products and services in a commercially reasonable manner and in accordance with applicable laws and the terms and conditions of this Agreement." (*Id.* at 303.)

The Invoicing and Payment provision of the Agreement required: "[Revere]'s payment of invoices shall be remitted to 3B Supply within thirty (30) days of the date of the invoice. . . .

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

[Revere] and 3B Supply will agree on the best methods of invoice consolidation and submission as business needs dictate, such as monthly, weekly, etc.  Invoicing shall take place no less frequently than once per month." (*Id.* at 303.)  Additionally, 3B was required to provide Revere with "the necessary information for [Revere] to remit payment as required hereunder." (*Id.*)

Given the considerable implementation costs associated with its MRO arrangements, 3B asserts it typically did not make a profit until at least one year into any MRO program.  (*Id.* at ¶ 14.)  For this reason, Part I of the Agreement included a liquidated damages provision to cover costs incurred if Revere terminated the contract without cause prior to the end of its three-year term.  (*Id.* at ¶ 15.)  Section 10.3 of the Termination provision of the Agreement stated: "Upon termination of this Agreement, [Revere] shall promptly, and in any event no later than agreed payment terms following such termination, make payment in full for all MRO products or services purchased but not paid for by [Revere] prior to such termination." (*Id.* at 304.)  Section 10.4 of the Termination provision further provided:

> In the event [Revere] terminates this Agreement *without cause* within one (1) year from the date of the first product invoice from 3B Supply, [Revere] shall pay to Supply One Hundred Dollars ($100.00) per hour multiplied by the number of hours spent implementing [Revere]'s MRO program.  In the event Buyer terminates this Agreement *without cause* during the second year from the date of the first product invoice, [Revere] shall pay 3B supply Seventy-Five Dollars ($75.00) per hour multiplied by the number of hours spent implementing [Revere]'s MRO program.  In the event Buyer terminates this Agreement *without cause* during the third year from the date of the first product invoice, [Revere] shall pay 3B supply Fifty Dollars ($50.00) per hour multiplied by the number of hours spent implementing [Revere]'s MRO program.  Such payment shall be considered liquidated damages and not a penalty.

(*Id.* at 304 (emphasis added).)  The Agreement does not define "cause." (*See id.*)

The final provision of Part I of the Agreement stated, "The Agreement shall be deemed complete and in full force after both PART I (Commercial Sections) and PART II (Legal Sections) are completed and signed." (*Id.* at 304.)

To implement the MRO program at the Revere Facility, 3B was required to send employees to provide support and training, both on-site and remotely. (*Id.* at ¶ 13.) To do so, 3B hired two full-time employees for the sole purpose of working on-site at the Revere Facility. (*Id.*) 3B hired Angela Schaffer as the Associate Program Manager and Bryce Simmons as the Assistant Program Manager. (Doc. 23-11; Doc. 27-2.)

3B began providing MRO services to Revere in October 2021. 3B issued its first product invoice to Revere on November 9, 2021. (Doc. 22-1 at ¶ 18.) In the following months, Revere asserts, and 3B disputes, Revere had issues with 3B's performance. (*See id.* at 311-25.)

On April 14, 2022, Angela Weichelt, the Revere Facility's Plant Controller, spoke with Nick Keesee, 3B's Implementation Manager, and others. (Doc. 23-24.) They discussed several of Revere's identified issues with 3B's performance. In an email dated April 15, 2022, Keesee sent a summary of the discussion. (*Id.* at 565, 568.) The summary listed ten "Identified Issues" and proposed a "Resolution" for each. (*Id.* at 568.) Examples of the identified issues included: invoices not being delivered timely; lack of savings report; and issues with incorrect ordering and billing. (*Id.*) Some of the proposed resolutions included: delivering monthly invoices by or before the 5th of the month; savings report to be delivered monthly; and an invoice audit. (*Id.*)

On April 21, 2022, Revere's counsel sent 3B a letter (the "Termination Letter") providing "formal notice of Revere's decision to terminate the Agreement with 3B effective immediately." (Doc. 22-1 at 311-14.) Revere asserted "3B is in default and/or breach of this Agreement" and listed eleven purported breaches under Part I: (1) failure to deliver timely invoices per Article 7; (2) failure to provide on-site representatives per Article 3, Article 6, and Appendix A.21; (3) incorrectly invoicing Revere for materials purchased by 3B personnel for personal use; (4) failure to issue Revere purchase credits following return of items ordered in error per Article 4;

(5) failure to provide savings reports as promised; (6) failure to maintain accuracy of all defined 3B supply inventories per Appendix A.1; (7) failure to issue spot by requisitions per Appendix A.11; (8) placing orders on multiple occasions outside of the approved methods of order submission per Article 3 and Article 6; (9) violation of Revere policies and procedures when, on March 25, 2022, 3B personnel brought their minor child into the Revere Facility, including in manufacturing areas, which exposed both 3B and Revere to significant potential liability; (10) a breach of cybersecurity related to a cyberattack/phishing attempt that was traced back to a 3B email account; and (11) unauthorized interference with facility internet access by 3B. (*Id.* at 311-12.)

Revere considered such breaches contrary to 3B's representations in Part I of the Agreement that 3B: "has experience, capability, and personnel necessary to provide the MRO products and services set forth in this Agreement," and "will provide the MRO products and services in a commercially reasonable manner and in accordance with applicable laws and the terms and conditions of this Agreement." (*Id.* at 313.)

The letter further noted, "Revere representatives have previously notified and discussed the above breaches and failure to perform with 3B, as recently as April 14, 2021. Accordingly, this letter constitutes a renewed notice of 3B's breach of the Agreement. The Agreement and applicable law do not require any opportunity to cure these breaches beyond what has already been provided to you, in good faith, by Revere." (*Id.*) Revere therefore "consider[ed] the Agreement *terminated for cause* . . . ." (*Id.* (emphasis in original).) Revere reserved all rights under the Agreement and stated the letter was sent "subject to Revere's continuing internal investigation and analysis." (*Id.*)

On May 4, 2022, counsel for 3B responded to Revere's Termination Letter. (*Id.* at 315-19.) 3B asserted "Revere has chosen to terminate the Agreement without cause and (with one non-material exception) has fabricated the 11 reasons set forth in the Termination letter in a transparent attempt to avoid payment of the implementation fees as provided in section 10.4 of the Agreement for a not-for-cause termination of the Agreement within its first year." (*Id.* at 315.) 3B was "willing to concede the possibility that one of its female employees brought her minor child with her to work" at the Revere Facility." (*Id.* at 317.) But 3B insisted it was "at best, a non-material breach of the Agreement, and at worst, a non-issue given the fact that it was not raised until four weeks after the fact." (*Id.* at 318.) 3B further asserted it never admitted to the other ten alleged breaches, and any discussions between Revere and 3B were customer service obligations, not requirements under the Agreement. (*Id.*)

To 3B, Revere's Termination Letter was an attempt to create "cause" to avoid the implementation fees under Section 10.4 of the Agreement for a not-for-cause termination within the first year of the Agreement. (*Id.*) 3B expended 2,910 hours implementing Revere's MRO program, and thus was owed $291,000 as liquidated damages under the Agreement. (*Id.*) 3B also asserted Revere owed 3B for its unpaid invoices through April 21, 2022. (*Id.*) 3B submitted an accounts receivable report, which it claims demonstrated Revere owed a total of $171,692.10 in past due invoices. (*Id.* at ¶ 27, 320-25.)

Revere asserts its investigation uncovered additional performance failures by 3B. (Doc. 27 at 668-72.) 3B failed to disclose Schaffer had a criminal background, including a charge of Child Endangerment. (Doc. 23-16; Doc. 23-22.) Revere asserts this was material because, on at least three occasions, Schaffer brought her minor child into the Revere Facility. (Doc. 23-14 at ¶ 10.) In February of 2022, 3B caused a 6-hour shut down of a production line at the Revere

Facility by failing to stock a required MRO product. (*Id.* at ¶¶ 8-9.) 3B failed to provide quarterly cost savings reports. (*See* Doc. 23-23 at 563; Doc. 23-24 at 568.) And 3B failed to provide timely invoices and failed to properly order products. (Doc. 27 at 670-72; Doc. 27-4 at ¶¶ 4-11; Docs. 27-5, 27-6, 27-7, 27-8.) According to Revere, 3B failed to identify the Revere employee who allegedly requested or authorized the products ordered by 3B, which made it impossible for Revere to verify the accuracy of the invoices. (*Id.*) Upon a closer review 3B's invoices, Revere discovered several inaccuracies, which is why 3B acknowledged an audit of 3B's invoices was necessary. (*Id.*; Doc. 23-24 at 568.)

### B. Procedural History

On May 8, 2023, 3B commenced an action against Revere in the Cuyahoga County Court of Common Pleas alleging breach of contract and unjust enrichment. (Doc. 1 at 1-2.) On June 7, 2023, Revere timely removed this action to this Court.[2]

On July 26, 2024, 3B moved for partial summary judgment on its breach of contract claims against Revere.[3] (Doc. 22.) Revere responded (Doc. 27), and 3B replied (Doc. 31).

Also on July 26, 2024, Revere moved for partial summary judgment as to 3B's request for liquidated damages. (Doc. 23.) 3B responded (Doc. 24), and Revere replied (Doc. 32).

On August 26, 2024, 3B moved to exclude information Revere relied on in its partial summary judgment motion and for attorneys' fees under Rule 37(c)(1). (Doc. 25.) Revere responded (Doc. 28), and 3B replied (Doc. 33).

---

[2] Although the parties dispute whether the fully executed version of Part I of the Agreement was properly attached to the removal complaint, the record demonstrates that both parties signed Part I of the Agreement and it is properly before this Court. (*See* Doc. 5 at 57; Doc. 22-1 at 305; Doc. 26; Doc. 30; Doc. 34.)

[3] 3B did not move for summary judgment on its unjust enrichment claim.

On September 6, 2024, Revere moved for permission to file documents under seal or, alternatively, to determine certain documents Revere filed are appropriately filed. (Doc. 29.) 3B did not respond or otherwise state any basis to maintain the identified documents under seal.

## II. LAW AND ANALYSIS

### A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted). A "material" fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) & (e). Rule 56 further provides "[t]he court need consider only" the materials cited

in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted). The Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

    **B.**  **Revere's Partial Motion for Summary Judgment**

  In Revere's partial motion for summary judgment, Revere asserts the liquidated damages provision in § 10.4 of Part I never became effective. (Doc. 23 at 326.) To Revere, because Part II was never executed, the Agreement never became effective under the unambiguous language of Part I, which 3B drafted. (*Id.* at 342-45.) Revere further argues executing both parts of the Agreement was a condition precedent to formation. (*Id.* at 345-46.) 3B therefore cannot enforce the liquidated damages provision, Revere urges. (*Id.* at 346.)

  In response, 3B asserts nothing in Part I of the Agreement stated Part I's enforceability was contingent on Part II being executed. (Doc. 24 at 592-94.) 3B argues the provision in Part I that Revere points to does not state that Part I was unenforceable until Part II was signed. (*Id.* at 594.) 3B asserts that language simply means the contract did not incorporate the legal terms in Part II unless and until Part II was signed. (*Id.*) In any event, both parties acted as though Part I was in full force and effect, including when Revere expressly quoted its terms in its Termination

Letter.  (*Id.* at 593)  As was the case with 3B's partial motion for summary judgment, 3B does not provide any legal support for its position and does not respond to Revere's cited authority on whether executing both parts was a condition precedent to formation.  (*Id.*)

3B's claim for liquidated damages therefore hinges on whether there is an enforceable contract between the parties under the plain language Part I of the Agreement, which 3B drafted.  The Court's analysis comes down to interpreting the final provision of Part I, which states, "The Agreement shall be deemed complete and in full force after both PART I (Commercial Sections) and PART II (Legal Sections) are completed and signed."  (Doc. 22-1 at 304.)

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008).  Ambiguity in a contract "should be construed against its drafter."  *Stevens-Bratton v. TruGreen, Inc*, 675 F. App'x 563, 570 (6th Cir. 2017) (citing *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 423 (6th Cir. 2008)).  "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."  *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (quotations omitted).  Courts cannot use extrinsic evidence to create an ambiguity.  *Id.* (citing *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)).

In interpreting a contract, the Court's role is to "give effect to the intentions of the parties as expressed in the language of their written agreement."  *Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (Ohio 2020).  "If the terms of the contract are clear and unambiguous, courts must give the words their plain and ordinary meaning and may not create a new contract by finding the parties intended something not set out in the contract."  *Saunier v.*

*Stark Truss Co., Inc.*, 65 N.E.3d 330, 333 (Ohio Ct. App. 2016) (citations omitted).  "Common words appearing in the agreement are to be given their plain and ordinary meaning unless manifest absurdity results . . . If the terms are clear and unambiguous, the court cannot interpret the contract in a manner inconsistent with the intent of the parties as expressed by their clear language."  *Kademenos v. Harbour Homeowners Assn.*, 951 N.E.2d 125, 129 (Ohio Ct. App. 2011) (citations omitted).

"[A] contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage."  *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) (quotations omitted); *see also Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (the court "must give meaning to every paragraph, clause, phrase, and word, omitting nothing as meaningless, or surplusage").

The explicit language in Part I states the Agreement would be "***complete and in full force after both***" Part I and Part II were executed.  (Doc. 22-1 at 304 (emphasis added).)  It is undisputed the parties executed Part I, but not Part II.  (Doc. 22 at 284; *id.* at ¶ 8, 305.)

Revere has teed up there is not an enforceable contract between the parties.  As the plaintiff proceeding on breach of contract claims, it is 3B's burden to establish the existence of a contract.  3B has not cited any case law establishing the existence of an enforceable contract under Ohio law.  (Doc. 24 at 592-94.)  Instead, 3B assumes, without any supporting legal authority, that because the parties executed Part I of the Agreement that 3B drafted and acted as if it were in effect, there was a valid and enforceable contract regarding the commercial terms of their relationship.  (*Id.*)

But principles of contract interpretation lead the Court to a different result.  3B's unambiguous language in Part I provides the Agreement would not be in full force until the

parties signed both Part I and Part II.  To the extent there is any ambiguity, it must be construed against 3B as the drafter.  *Stevens-Bratton*, 675 F. App'x at 570.  3B's contention that nothing in Agreement states Part I was unenforceable until Part II was signed is not expressed in the language it drafted.  *See Saunier*, 65 N.E.3d at 333.  To interpret that the commercial terms in Part I governed the parties' relationship, even though they never completed Part II of the Agreement, would render the final provision in Part I meaningless.  *Eastham*, 754 F.3d at 363.

The Court finds that under the plain language of the Agreement, it never became an enforceable contract between the parties.  The parties did not complete and sign Part II.  It follows that the Agreement was not "complete and in full force."  3B cannot maintain its breach of contract claims against Revere.  Accordingly, Revere is entitled to judgment as a matter of law on the liquidated damages provision.  3B's claim for unjust enrichment stands to address any outstanding invoices for goods Revere accepted but has not paid for.

      **C.**    **Revere's Motion to File Documents Under Seal, or, Alternatively, to Determine Certain Documents Are Appropriately Filed**

Revere contends it inadvertently submitted four documents marked as "Confidential" by 3B, pursuant to the parties' protective order, as exhibits to Revere's summary judgment briefing.  (Doc. 21; Doc. 29 at 882.)  The exhibits include portions of 3B's personnel files, from which the parties previously agreed to redact the personal and confidential information.  (Doc. 29 at 884.)

On September 4, 2024, 3B's counsel requested Revere work with the Court to get the documents removed from the public docket by the end of the next business day.  (Doc. 29-1 at 890.)  On September 5, 2024, Revere's counsel responded, requesting 3B provide Revere its position as to what portions of the documents are confidential or whether 3B believed the entire documents should be filed under seal.  (*Id.* at 889-90.)  3B did not respond or otherwise state any basis to maintain the identified documents under seal.  (Doc. 29 at 882 n.1.)  Revere requests

permission to file the documents under seal or, alternatively, asks this Court to determine the documents are not confidential and are therefore appropriately filed.  (*Id.* at 882-86.)

Revere has identified there may be personal information contained in the documents at issue.  Accordingly, the Court will provisionally grant the request to seal the documents.  As the "proponent of sealing," 3B must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations."  *Shane Group Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305-06 (6th Cir. 2016) (citation omitted).  It is therefore 3B's obligation to put forth proposed redactions.  Otherwise, the seal will be lifted and the documents will be publicly available.

### III.     CONCLUSION

For the reasons stated herein, Defendant's partial Motion for Summary Judgment (Doc. 23) is GRANTED.  Defendant's Motion for Permission to File Documents Under Seal (Doc. 29) is provisionally GRANTED, and Plaintiff is ORDERED to submit proposed redactions to the Court within ten business days.  Plaintiff's failure to timely submit proposed redactions will result in the documents becoming public in full.

**IT IS SO ORDERED.**

**Date:**  March 28, 2025

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE